# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 13-5056-01-CR-BP |
| RICARDO VARGAS-VILLALOBOS, | ) ) ) |
| Defendant. | ) ) ) |

## REPORT AND RECOMMENDATIONS OF UNITED STATE MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. Defendant Ricardo Vargas-Villalobos filed a Motion to Suppress Statements in the matter (Doc. 26). Vargas-Villalobos argues that any and all statements he made to law enforcement on December 19, 2012, should be suppressed because the defendant did not receive *Miranda* warnings prior to making the statements. A hearing was held on the motion on August 25, 2014. Defendant Vargas-Villalobos was present with counsel, Nancy R. Price. The United States was represented by Patrick Carney. For the reasons set forth below, **IT IS HEREBY RECOMMENDED** that the Motion to Suppress Statements be **DENIED**.

### FINDINGS OF FACT

Detective Brian Martin, a Southwest Missouri Cybercrimes Task Force Officer testified that on December 19, 2012, he participated in the execution of a search warrant at the residence of Defendant Ricardo Vargas-Villalobos (Vargas). Deputy Martin testified that Vargas returned to the residence after agents had already begun searching the house. Martin told Vargas that

officers were executing a search warrant searching for child pornography. Martin told Vargas he would like to speak with him. Vargas responded that he "really needed" to talk to the officers, but he did not want to do so in the house in front of his father. Martin testified that they could not conduct the interview in Vargas's bedroom because it was being searched. Vargas asked Martin if they could talk outside; Martin agreed. Due to the cold temperature, Martin, Vargas, and another agent, Charles Root, moved into Martin's patrol car, an unmarked Ford 500.

Martin testified that Vargas agreed to speak with agents in the car. Vargas was not handcuffed; neither agent drew a weapon. Martin told Vargas that he was free not to speak with agents, but Martin never told Vargas that he was not free to leave. Vargas was never advised that he would be placed under arrest, and he was never placed under arrest. Vargas never asked for questioning to stop; he never requested an attorney. At the end of the interview, Vargas left the vehicle. Martin testified on cross-examination that at the beginning of the encounter with Vargas, inside the house, Vargas asked if he would be arrested. Martin responded, "Probably not, not right now."

Defendant Vargas's brother, Luis Vargas, also testified at the hearing. Luis Vargas testified that he was sleeping at the time officers arrived at the home he shared with his brother Ricardo, and his father Ramon Vargas. He testified that he awoke to voices in the house. He came out of his bedroom and saw his father Ramon Vargas sitting on a couch in the living room. Officers were already searching the house. Unidentified officers informed Luis Vargas that they were searching for child pornography. Officers ordered Luis to sit down on the couch. Luis testified that he did not feel free to get up and leave the couch and he did not feel free to leave the residence.

2

Case 3:13-cr-05056-BP   Document 31   Filed 11/10/14   Page 2 of 9

Ricardo Vargas (the defendant) arrived at the house approximately an hour after the officers. Luis Vargas saw the officers ask Ricardo Vargas whether he had anything to tell him. He watched officers "pull" Ricardo back to his room, then walk out of the front door with him to a vehicle. Luis Vargas testified that he never heard an officer tell Ricardo that he didn't have to answer questions, and never heard an officer tell Ricardo that he could leave. Luis testified that Ricardo and the officers later returned to the residence.

Ramon Vargas, Defendant Ricardo Vargas's father, testified at the hearing through an interpreter. He testified that the officers knocked on the door and entered the residence. Officers told him to sit on the couch and not to move. Ramon testified that Luis Vargas came into the living room two or three minutes after officers arrived. Officers also told Luis to sit down and not to move. Ramon testified that he sat for approximately forty-five minutes, after which he asked the officers for permission to leave to go to work. The officers allowed him to leave.

Defendant Ricardo Vargas also testified at the hearing. He stated that upon arriving at his residence he saw law enforcement cars in the driveway. He reasoned that the cars belonged to friends of his brother. When he entered the house, he jokingly asked whether he was in trouble. The officers introduced themselves and told Vargas that they were looking for child pornography. Vargas attempted to walk back to his room, but officers prevented him from doing that and told him to sit at the kitchen table. Vargas asked whether they could talk at the back of the house for privacy. The officers told him no. Vargas testified that he was not told he was free to leave the residence, not told that he did not have to speak with officers, and did not feel he was free to leave the residence. On cross-examination, Vargas testified that no officer drew a weapon or placed him in handcuffs, and he did not recall that any officer laid hands on him. He testified that while he did say that he agreed to speak with officers, he did not feel he could

refuse. He further testified that when officers told him they could not speak at the back of the house and asked him whether he would speak with them in the vehicle, he did not feel like he was being given an option whether or not to speak, but only where. He testified that he "reluctantly" agreed to speak in their vehicle. Vargas testified that he asked officers if he would be arrested. They responded probably not, which Vargas interpreted as probably yes. Vargas testified that he did not ask to leave the residence, but he also did not feel as if he could ask to leave the residence. He did not ask for an attorney, and he did not ask that the questioning be stopped. He testified that the interview lasted 30 or 40 minutes. Vargas testified that when the interview was over he was not arrested, nor was he taken to the police station.

In closing, the government argued that Vargas was not in custody for purposes of *Miranda* while he was interviewed in the car by agents Martin and Root. The government conceded that Vargas was interrogated, but maintained that under the objective standard set forth in *Miranda* and its progeny, Vargas was not "in custody" during the interview.

Vargas, through counsel, argued that officers should have read Vargas his *Miranda* warnings prior to interviewing him because the circumstances experienced by Vargas reflected that he was in custody. At no time before or during the interview did officers make an express statement to Vargas that he was not under arrest and that his participation in the interview was voluntary.

The Court has reviewed the approximately one-hour recorded interview with agents Martin and Root. Vargas made a number of incriminating admissions during the interview regarding his downloading of child pornography. Periodically throughout the interview, Vargas asked officers whether he would be arrested and whether he would go to jail. Deputy Martin answered him each time by saying not right now, or not today. At one point Martin told Vargas

specifically that he is "absolutely not going to jail today." The officers asked Vargas a number of questions, but at no time did Vargas indicate that he wanted to stop answering questions or leave the interview.

A federal grand jury indicted Vargas eleven months later, on November 6, 2013, on one count of the receipt and distribution of child pornography. He was arrested the next day.

## CONCLUSIONS OF LAW

In *Miranda v. Arizona*, the Supreme Court held that a criminal suspect must be informed of his right to be free from self-incrimination and the right to counsel before a custodial interrogation by law enforcement. 384 U.S. 436, 444 (1966). Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* To determine whether a suspect is in custody, a court looks to the "physical or psychological restraints" placed upon the suspect in comparison to whether a "reasonable person in the suspect's position" would have understood him or herself to be in custody. *United States v. Griffin*, 922 F.3d 1343, 1347 (8th Cir. 1990) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). The court's "ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). A court looks to the totality of the circumstances surrounding the interrogation, s*ee Griffin*, 922 F.3d at 1347 (citing *United States v. Carter*, 884 F.2d 368, 370 (8th Cir. 1989)), and determines in light of those circumstances whether a reasonable person would "have felt he or she was not at liberty to terminate the interrogation and leave," *LeBrun*, 363 F.3d at 720 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). If a reasonable person in the suspect's circumstances would have

5

considered his freedom to move about or leave the scene curtailed, and his or her belief was objectively reasonable, then the suspect is considered "in custody." *Griffin*, 922 F.3d at 1347 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Courts do consider the location of questioning or interrogation as part of its analysis to determine whether a suspect was in custody for purposes of *Miranda*. But, "*Miranda* warnings are not imposed because the questioning is conducted in a certain place, i.e., a patrol car . . . ." *United States v. Boucher*, 909 F.2d 1170, 1174 (8th Cir. 1990). Rather, the location is part of the court's "reasonable person" analysis. *Id.* (quoting *Berkemer*, 468 U.S. at 442). A court looks to the following six indicia of custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002) (quoting *Griffin*, 922 F.2d at 1349).

In applying the *Griffin* indicia to the facts of the case, the Court recommends that an objectively reasonable person in the suspect's position would have understood that he was not in custody during the interview. First, officers informed Vargas that he was not under arrest and would not be arrested that day. Second, Vargas was not handcuffed or restrained in any way during the questioning. He was confined to the front seat of the agent's car, but there is no indication that the door was locked or he was otherwise prevented from leaving the car. Third, Vargas testified that he voluntarily entered the car and voluntarily spoke to agents Martin and Root, albeit "reluctantly." Fourth, the audio recording reveals no use of strong-arm tactics or deceptive strategems during questioning. Indeed, Vargas sounded relieved, and stated he felt

6

relieved, after questioning. Fifth, the atmosphere of the questioning was likely police dominated on the basis of the presence of two officers in an enclosed vehicle with Vargas. On the other hand, though, at no point during the interview did Vargas sound reluctant to talk, or did it sound like he was being coerced into saying anything against his will. Finally, and notably, Vargas was not arrested at the termination of the questioning.

The Eighth Circuit's opinion in *United States v. Plumman*, 409 F.3d 919 (8th Cir. 2005), is instructive. In that case, two FBI agents drove to Plumman's house to talk to him about allegations that he had sexually abused two minor girls. The agents advised Plumman that he was not under arrest and would not be arrested at the end of the interview. Plumman agreed to speak with the agents. He voluntarily walked outside of his house and into his driveway and entered the agents' vehicle, where the interview occurred. Plumman sat in the front passenger's seat. One agent sat in the driver's seat, and the other sat in the back seat, behind the driver. The agent in the front seat interviewed Plumman for approximately three and one-half hours, during which time Plumman made incriminating admissions. At the end of the interview, Plumman agreed to make a recorded statement, after which he exited the vehicle and returned to his house. Plumman was arrested on charges in tribal court approximately five days later. Approximately one month later, a federal grand jury indicted Plumman on federal charges. Approximately two weeks after that , Plumman was taken into federal custody on the indictment. *Id.* at 922-23.

The Eighth Circuit held that Plumman was not "in custody" during the interview in the FBI agent's vehicle. The appellate court applied the *Griffin* indicia, highlighting the agent's statements to Plumman that he was not under arrest, and would be not be arrested after the interview. The agent also informed Plumman that he did not have to talk if he did not want to, and if he chose to speak with the agents, he was free to stop at any time and exit the vehicle.

7
Case 3:13-cr-05056-BP   Document 31   Filed 11/10/14   Page 7 of 9

Plumman agreed to speak with agents, and he did not refuse to answer any questions or leave the vehicle. The Court further determined that the agents did not "employ strong-arm or deceptive tactics" in the interview. The Court acknowledged that the interview was "police dominated" based on the fact that two FBI agents were in the vehicle, but also found that Plumman was not handcuffed or restrained, the vehicle was unlocked, and parked in a residential neighborhood during the daytime, and although both agents were armed, neither agent displayed their firearms, and no other weapons were visible inside the vehicle. On balancing of the *Griffin* indicia, the Eighth Circuit found that Plumman was not in custody and his statements were voluntary. *Id.* at 924-25.

Similarly, agents Martin and Root told Defendant Vargas more than once that he was not under arrest, and would not be arrested that day. Vargas agreed to speak with the agents, albeit reluctantly, according to his own testimony. He asked that they speak somewhere more private than his dining room. Vargas voluntarily entered the agent's vehicle for the interview. Vargas did not refuse to answer any questions and did not ask to leave to vehicle. Vargas testified, however, that he did not feel as if his participation in the interview was voluntary.

The Court has reviewed the audio recording of the interview, and heard the testimony of both the agent and Vargas, and believes, based upon the totality of the circumstances, a reasonable person would have believed that he or she was free to terminate the interrogation and leave. The Court further recommends that this conclusion is objectively reasonable. Although, as in *Plumman*, the interview was "police dominated" based upon the mere presence of two agents in an enclosed vehicle with Vargas, neither acted in a coercive manner and neither exposed or brandished a weapon. Vargas was not handcuffed, and he did not recall that any officer laid hands on him. Vargas was repeatedly told that he was not under arrest and would not
8

Plumman agreed to speak with agents, and he did not refuse to answer any questions or leave the vehicle. The Court further determined that the agents did not "employ strong-arm or deceptive tactics" in the interview. The Court acknowledged that the interview was "police dominated" based on the fact that two FBI agents were in the vehicle, but also found that Plumman was not handcuffed or restrained, the vehicle was unlocked, and parked in a residential neighborhood during the daytime, and although both agents were armed, neither agent displayed their firearms, and no other weapons were visible inside the vehicle. On balancing of the *Griffin* indicia, the Eighth Circuit found that Plumman was not in custody and his statements were voluntary. *Id.* at 924-25.

Similarly, agents Martin and Root told Defendant Vargas more than once that he was not under arrest, and would not be arrested that day. Vargas agreed to speak with the agents, albeit reluctantly, according to his own testimony. He asked that they speak somewhere more private than his dining room. Vargas voluntarily entered the agent's vehicle for the interview. Vargas did not refuse to answer any questions and did not ask to leave to vehicle. Vargas testified, however, that he did not feel as if his participation in the interview was voluntary.

The Court has reviewed the audio recording of the interview, and heard the testimony of both the agent and Vargas, and believes, based upon the totality of the circumstances, a reasonable person would have believed that he or she was free to terminate the interrogation and leave. The Court further recommends that this conclusion is objectively reasonable. Although, as in *Plumman*, the interview was "police dominated" based upon the mere presence of two agents in an enclosed vehicle with Vargas, neither acted in a coercive manner and neither exposed or brandished a weapon. Vargas was not handcuffed, and he did not recall that any officer laid hands on him. Vargas was repeatedly told that he was not under arrest and would not

be arrested or taken to jail unless and until the investigation progressed further. At the conclusion of the interview, Vargas left the vehicle and returned to his home. He was not arrested until eleven months later. A reasonable person in Vargas's shoes would have believed he was free to stop answering questions and leave the vehicle at any time. Vargas did state that he did not believe he was free to leave the scene, or to refuse questions from the officers, but Vargas's subjective belief is of limited value in this analysis, as the Court is instructed to consider the totality of the circumstances from the viewpoint of an objectively reasonable person.

Taken together, the testimony of Deputy Martin, Defendant Vargas (and to a lesser extent of his father and brother), and the audio recording of the interview demonstrate that Vargas was not "in custody" during the interview. He was informed he was not under arrest, would not be arrested that day, and was, in fact, not arrested that day. He was not physically restrained, and he voluntarily entered the car and answered questions of the officers. Vargas was not coerced into speaking with the agents. On balance, the Court finds that these factors demonstrate that a reasonable suspect in Vargas's shoes would believe himself not to have been "in custody" that day. Accordingly, the undersigned respectfully recommends that Defendant Vargas's Motion to Suppress be denied.

## CONCLUSION

Therefore, based on all the foregoing,

**IT IS HEREBY RECOMMENDED** that the Motion to Suppress Statements and Evidence be **DENIED**.

**DATED: November 10, 2014**

    /s/ *David P. Rush*
**DAVID P. RUSH**
**United States Magistrate Judge**